**Daniel H. TUTTLE, Appellee,**

v.

**AMERICAN OIL COMPANY, Appellant.**

**No. 8241.**

United States Court of Appeals
Fourth Circuit.

Argued April 17, 1961.

Decided June 21, 1961.

Harold A. Mouzon, Charleston, S. C. (B. Allston Moore, and Moore & Mouzon, Charleston, S. C., on brief), for appellant.

Benny R. Greer and James P. Mozingo, III, Darlington, S. C. (Archie L. Chandler, Darlington, S. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

This is an appeal from a judgment in favor of the plaintiff, Daniel H. Tuttle, a seaman, against the defendant, The American Oil Company, for maintenance and cure in the amount of $16,360. It is urged that the evidence was insufficient to support a finding of Tuttle's entitlement to maintenance and cure subsequent to June 5, 1956.

While working as a member of the crew of the defendant's ship at the Port of Aruba on July 4, 1955, Tuttle sustained injuries including broken ribs, bruises and injury to his back. He was

assisting in making fast a gangway when it fell to the wharf carrying him with it.

This action was commenced on March 22, 1957. Tuttle claimed the accident was due to defendant's negligence and asked damages under the Jones Act, 46 U. S.C.A. § 688, and also for maintenance and cure. By agreement of court and counsel, the question of maintenance and cure was reserved for decision by the court on the basis of testimony to be presented at the jury trial of the claim under the Jones Act. On January 29, 1960, the jury found negligence on the part of the defendant and that plaintiff's damages amounted to $28,333.34 but, because the accident was fifty per cent due to Tuttle's contributory negligence, the verdict should be for only $14,166.67. The plaintiff moved for a new trial on the ground of inadequacy of the verdict, which motion was denied and he appealed to this court but the appeal was later abandoned. On December 8, 1960, the court awarded maintenance and cure computed as follows:

| | | |
|---|---|---|
| 10 months, 1956 = | 300 days | |
| 12 months each, 1957–1960 48 months at 30 days = | 1,440 days | |
| 6 months, 1961 at 30 days =, | 180 days | |
| 1,920 days at $8.00 a day | = | $15,360.00 |
| Cost of operation | = | 1,000.00 |
| Total | | $16,360.00 |

There was evidence to show that, following the accident, Tuttle received treatment in Aruba and, upon his vessel's return to the United States, he was a patient in the Marine Hospital in Baltimore for a short while and then in the Marine Hospital at Savannah, Georgia. The broken ribs healed without difficulty but the plaintiff was troubled by pain in his back which improved under treatment until he was discharged on September 20, 1955, as fit for duty. However, since he still complained of his back he was readmitted to the hospital on November 22, 1955, and was treated until January 5, 1956, when he was again discharged as fit for duty. The plaintiff offered the testimony of two of the doctors on the staff of the Savannah Marine Hospital, Dr. Cameron, a surgeon, and Dr. Amburgey, an orthopedist to whom the plaintiff was referred for examination. Dr. Cameron said that Tuttle had a lumbo-sacral strain which was treated by physiotherapy and rest on a hard mattress. X-rays were made. Dr. Cameron found no indication of a disc injury nor did Dr. Amburgey. Dr. Amburgey used the term, "lumbar fasciatis," rather than "lumbo-sacral strain."

On June 5, 1956, Tuttle was examined by Dr. Siegling, a leading orthopedist of Charleston, South Carolina. *This was at the instance of the defendant shipowner acting through counsel.* Dr. Siegling testified that Tuttle's only complaint at that time appeared to be stiffness and discomfort in his back and difficulty in lifting more than fifty pounds and that "careful physical orthopedic examination revealed no evidence of physical trouble." There was no muscle spasm, no limp, no atrophy and reflexes were normal. The X-rays showed an entirely normal back and spine. There was no indication of disc injury. Dr. Siegling thought Tuttle to be thoroughly fit to resume work as a seaman.

In June 1957, some three months after the institution of this action and about a year after Dr. Siegling's examination, Tuttle, still complaining of his back and legs, was sent by his own counsel to Dr. Manganiello, a neurosurgeon of Augusta, Georgia. This doctor found spasm of muscles of the low back, slight interlineal tenderness over the base of the spine, weakness in the left foot and bilateral numbness from the knee down. Dr. Manganiello determined that there must be a herniated disc, that Tuttle should have a myelogram done and that he probably needed an operation. The myelogram was not performed until October 31, 1957. Dr. Manganiello concluded that it disclosed a herniated disc and recommended "that the patient have an excision of his disc with a hemilaminectomy and a fusion" which, in his opinion, would greatly reduce the existing disability. At the time of the trial and the entry of judgment for maintenance and cure, no operation had been performed. Dr. Manganiello did not see Tuttle again until January 1960, a few days before the jury trial. Except for an alleged mental degeneration, the doctor observed no further change of condition other than some slight diminution of ankle reflexes. On motion of the defendant, Tuttle was examined on January 18, 1960, by Dr. Smith, also a neurosurgeon of Augusta, Georgia. Dr. Smith found Tuttle limping, rotating his left leg out and using a cane, and complaining of pain in the back and pain and numbness in the left leg but found no symptoms indicating a herniated disc and testified that Tuttle's behavior during the examination was "the usual pattern for an individual that is not completely acquainted with the anatomy to simulate sensory findings or numbness. It is the usual pattern for a simulation."

The plaintiff himself was not produced as a witness. There was testimony to the effect that he was mentally disturbed although it does not affirmatively appear from the record that his failure to testify was due to mental incapacity. Dr. Johnson, a psychiatrist to whom Tuttle had been referred by Dr. Manganiello for mental examination, testified that Tuttle was suffering from delusions, that he had severe paranoid reactions which condition would progress and "deteriorate into the condition that is commonly called paranoid schizophrenic." He further testified that the plaintiff had a persecution complex, that he was mentally disturbed to the extent that he was then totally and permanently disabled and unfit to work as a seaman. There was testimony to the effect that his mental disturbance could have resulted from his injury.

Dr. Ackerman testified that he had been the Tuttle family physician for years and that he had known the plaintiff since childhood; that he knew of the back injury and had prescribed medicine to afford the plaintiff relief from pain in his back and legs since the accident. Dr. Ackerman observed a change in plaintiff's personality and mental condition, stating "for the last few months he is gradually getting worse."

The brief of the defendant shipowner contains the following:

"There appears to be no dispute between the parties as to the applicable law in this case. Tuttle, having been injured in the service of the ship, became entitled under the ancient admiralty law to maintenance and cure and wages to the end of the voyage. There is no claim that wages were not duly paid. While it does not appear in the record, it was agreed between counsel that maintenance was payable at the rate of eight dollars per day. Tuttle was entitled to such maintenance and to necessary medical and hospital treatment until he was cured of his injuries or, if a cure was not possible, until he reached maximum improvement."

We find no fault with this statement of the principles to be applied.

But the defendant contends that there is a sharp disagreement as to the facts and that certain findings of the District Court are not supported by the evidence.

Particularly is our attention directed to the following excerpts from the District Court's opinion and order:

"Although there is some difference of opinion as to what extent the disability now suffered by the plaintiff was due to the accident, there is an unbroken chain of evidence showing that the plaintiff injured his back and has had serious trouble with his back since the date of the accident. There is direct and positive evidence to the effect that the injury caused the trouble that plaintiff has had with his back since the time of the injury. * * *

* * * * * *

"The record in this case is clear that the plaintiff sustained a back injury while serving as a member of the crew of the defendant's ship in July of 1955. The record shows that he has suffered continuously from this injury up to the present date. Competent medical authority states unequivocally that this man needs surgery to his back to correct the disability suffered as a result of this accident, and that a minimum of six months' recuperation will be required before the plaintiff reaches maximum improvement."

 The District Court's findings of fact are not to be set aside unless clearly erroneous, and due regard is to be given to the opportunity of the trial court to judge of the credibility of the witnesses. Rule 52(a) Federal Rules of Civil Procedure, 28 U.S.C.A. No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20. We are not convinced that the findings of the court below are clearly erroneous.

True, there were conflicts in the evidence but the principal conflicts are to be found in the testimony of the witnesses who testified in person before the court and jury. There was conflicting opinion evidence as to the cause, nature and extent of Tuttle's injuries. But it is clear that the trial judge accorded great weight to Dr. Manganiello's testimony which the defendant chooses virtually to ignore in its attack upon the sufficiency of the evidence. In the transcript of Dr. Manganiello's testimony we find the following:

"Well, I saw him in June. And then I had him admitted in the hospital in October of '57, at which time I did this myelogram. And when I saw this myelogram I recommended that the patient have an excision of his disc with a hemilaminectomy and a fusion."

* * * * * *

"From his history and his symptoms it was my impression that his difficulty in his back was due to the fall he had off the ship when he hurt his back at that time."

* * * * * *

"Yes, that was based on the history that he never had any back trouble before and never had any trouble with his back until after that injury. And he had been having trouble on and off ever since then with his back and legs."

This doctor testified that at the time of the trial and because of the condition in the plaintiff's back, he was 100% disabled to do the work of a seaman and, further, after surgery is performed, "Well, at the end of that time he should be able to, as far as his back is concerned, if the fusion is a success and there is good union, he should be able to perform his duties of heavy work as a seaman perfectly well."

The defendant seems to contend that because Dr. Siegling, the physician to whom plaintiff was sent by the defendant for examination, did not diagnose a herniated disc on June 5, 1956, the court

tracttroduction impliesivenesss

should disregard all the other evidence in the case and find in favor of the defendant, but Dr. Cameron testified:

"That's right. I mean he didn't have the typical symptoms of a disc injury. He didn't have the typical findings, physical findings of a disc injury. Discs may produce a typical symptom, but you can never say that a person has no disc, but he did not have the symptoms on physical findings."

Referring generally to herniated discs, Dr. Manganiello said:

" * * * If you rest up for a while, for two or three weeks, they may slip back in place and you may be free of pain. And you may be able to walk around a little bit without too much difficulty. But the minute you start bending, lifting, or twisting it herniates again and then you start having trouble all over again. So, if he was to be examined during a remission when he was free of the pain and the thing had slipped back in he might pass the physical if he didn't give a history of back trouble. But the minute he started doing any heavy work or lifting he would experience trouble again."

Dr. Manganiello explained in detail the procedure involved in performing the myelogram upon which he based his diagnosis of a herniated disc. There was no dispute in the testimony that if the plaintiff were to undergo surgery, he would be further disabled for a period of at least six months and that such surgery would cost approximately $1,000. The District Court's judgment for maintenance and cure included a six months' period of disability in the future and the cost of the hospitalization and surgery. The court concluded that at the end of the recuperative period the plaintiff would reach maximum improvement.

Defendant shipowner further contends that there is nothing in the record concerning plaintiff's physical condition, his ability to work or his need of maintenance and particularly during the period between October 1957 and January 1960. Dr. Ackerman, the family physician, testified that he had been prescribing medicine to relieve pain in the plaintiff's back since the accident. In Dr. Johnson's testimony he recited the substance of his conversation with the plaintiff wherein the plaintiff told him of the accident, the injury to his back and his condition since that time. This testimony was in part as follows:

" * * * Following this he returned to the Marine Hospital about November of '55, was given more physiotherapy for approximately forty-six days, was discharged, said that he was told to ship out; said he didn't feel that he was in shape to. He tried to do some interior decorating but said he was unable to do this. He didn't feel that he was able to lift more than about fifty pounds at that time. After being discharged from the Marine Hospital in Savannah he was told to report back to that hospital in 90 days, and was told at that time that his physical examination was negative; that he should forget these aches, complaints that he had and go on back to work. However, he didn't feel that he was able to return to work. And about this time, or three years ago or a little longer, he wasn't sure of the exact date, he started developing severe pain in his legs where he said his legs would feel like they were getting paralyzed, would draw up. And he would have to call his wife or someone to come and straighten his legs out. This would be followed by severe swelling, nausea, and various other anxiety type complaints, such as some shortness of breath, palpitations, and some difficulty in sleeping at night and other anxiety type symptoms."

The evidence disclosed plaintiff's hospitalization on two occasions following the accident of which the defendant had notice. In June of 1956 defendant sent plaintiff to Dr. Siegling for examination, which fact supports the inference that

the defendant knew of plaintiff's continued complaints concerning his injury. In addition, in March 1957 defendant was served with a complaint wherein plaintiff alleged that he had been injured and demanded payment for his injuries as well as maintenance and cure. The pending proceedings constituted notice of plaintiff's continuing need for maintenance and cure.[1]

Complaint is further made that, in connection with the computation of the award for maintenance and cure, the court referred to a deposition of the plaintiff and found therefrom that Tuttle had "received no maintenance since January 1956," that he had "received income for a maximum of eleven days since 1956," that he "has done no other work since the accident and has received no other income." It is contended that this deposition was not a part of the record and was not properly before the court.

We are completely unenlightened concerning the alleged improper reference by the court to the deposition of Tuttle. We find no such deposition in the record before us nor is it specifically mentioned in the designation of the record on appeal. However, there is no suggestion that the entire record below was brought here. Plaintiff's counsel assert that this deposition was presented "to the court as evidence."

Earlier mention has been made of the fact that the *plaintiff* took an appeal to this court based upon inadequacy of the verdict and judgment resulting from the jury trial, which appeal was abandoned. In the designation by the defendant of the record in this present appeal, the following appears as the first item: "The record in the first of the pending appeals now before the Circuit Court of Appeals." Included among the designations on the first appeal is a "Statement of Relevant Docket Entries" whereon, as item 10, appears the following entry: "Deposition of Daniel H. Tuttle, filed July 22, 1959." In the same list of dock-

et entries there are references to depositions of Lurie P. Poston, Jr., Dr. Waldon M. Sennott, Miss Layola Voelker, Mrs. Margaret E. Walker, Dr. D. S. Cameron and Dr. T. A. Amburgey, "filed" on various dates. The designation of the record on the first appeal refers to the depositions of Dr. Cameron and Dr. Amburgey and these depositions are before us. But, before us is also the deposition of Margaret E. Walker which was not included in the designation. The depositions of no other persons appearing in the statement of relevant docket entries are here nor is any explanation offered concerning their absence. In this confused state of the record we are not prepared to hold that the judge acted improperly in referring to plaintiff's deposition which is shown to have been filed in the case.

It has been suggested that the $1,000 included in the court's award as the approximate cost of the recommended surgical operation might properly be deducted because it may have been considered and included by the jury as an element of damage in the trial under the Jones Act. This, however, was a necessary item of expense if the plaintiff was to be cured and attain maximum improvement in his condition. An examination of the judge's charge to the jury reveals that the jury was not instructed or authorized to consider this item in arriving at its verdict. The judge told the jury to consider as elements of damage only the following: Loss of wages from the time of injury to the time of trial, and any such loss reasonably to be anticipated in the future; pain and suffering; disfigurement as a result of the injury explained by the judge to mean "any limp or any other thing which would change the appearance of the plaintiff to the public."

Each of the parties directs our attention to the cases of Calmar S. S. Corp. v. Taylor, 1938, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993, and Farrell v. United

1. Brown v. Dravo Corporation, 3 Cir., 1958, 258 F.2d 704, 709, certiorari denied 1959, 359 U.S. 960, 79 S.Ct. 800, 3 L.Ed.2d 767.

States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850.

In Calmar the Court denied recovery of a lump sum awarded by the lower court as maintenance and cure *for life* to a seaman who fell ill of an incurable disease which was not directly connected with but which developed while in the employment of the shipowner, and at 303 U.S. 531, 532, 58 S.Ct. 655, stated:

> "The seaman's recovery must therefore be measured in each case by the reasonable cost of that maintenance and cure to which he is entitled at the time of trial, including, in the discretion of the court, such amounts as may be needful in the immediate future for the maintenance and cure of a kind and for a period which can be definitely ascertained."

In Farrell the Court held that the liability for maintenance and cure extends only to the time when the maximum cure possible has been effected. There the seaman had overstayed his leave and, in rain and darkness while attempting to make his way to the ship, became lost and fell into a drydock about a mile from where his ship was moored. At 336 U.S. 515, 516, 69 S.Ct. 707, 709, the Court said:

> " * * * In Aguilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 932, 87 L.Ed. 1107, the Court pointed out that logically and historically the duty of maintenance and cure derives from a seaman's dependence on his ship, not from his individual desserts, and arises from his disability, not from anyone's fault. * * * Aside from gross misconduct or insubordination, what the seaman is doing and why and how he sustains injury does not affect his right to maintenance and cure, however decisive it may be as to claims for indemnity or for damages for negligence."

The Calmar and Farrell cases are cited and their principles applied in Brown v. Dravo Corporation, 3 Cir., 1958, 258 F.2d 704, 708–709, certiorari denied 1959, 359 U.S. 960, 79 S.Ct. 800, 3 L.Ed. 2d 767. There the court stated:

> "The respondent contends further that a shipowner fulfills his obligation of maintenance and cure by supplying the seaman with a hospital ticket, which the respondent did in October 1947, and therefore, it cannot be chargeable for maintenance and cure because of the continuing leg condition. Furthermore, says the respondent, it is unconscionable to charge it with more than nine years' maintenance for a condition which was never reported by the seaman and which it did not know existed during that time. And its final argument is that the obligation to provide maintenance and cure exists only for the duration of the voyage and a reasonable time thereafter, relying for this proposition on Calmar S. S. Corp. v. Taylor, 1938, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993, and Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850. The answer to these arguments is that the district court found that respondent was sufficiently apprised of libellant's condition when the suits were filed on March 15, 1948 and that the pending proceedings constituted notice of libellant's continuing need for maintenance and cure. The duty to provide maintenance and cure did not stop with the libellant's severance from employment, Murphy v. American Barge Line Co., 3 Cir. 1948, 169 F.2d 61, 64, certiorari denied 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406, for it is the duty of the ship to maintain and care for the seaman after the end of the voyage until he is so far cured as possible. Farrell v. United States, 1949, 336 U.S. 511, 518, 69 S.Ct. 707, 93 L.Ed. 850. The duty to provide maintenance and cure thus continues until the time when the maximum cure possible has been effected, and the district court did not award the libel-

lant more than this. We, therefore, find no error in its judgment in this regard."

The interesting case of Scott v. Lykes Bros. S. S. Co., D.C.E.D.La.1957, 152 F. Supp. 104, applies the principle that the seaman is entitled to maintenance during the period of rehabilitation and until maximum cure is effected.

Being of the opinion that the evidence is sufficient to sustain the award for maintenance and cure, we affirm.

Affirmed.