**Max L. BAILEY, Plaintiff,**

v.

**John W. GARDNER, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. 2207.**

United States District Court
S. D. West Virginia,
Huntington Division.

June 2, 1967.

Norman E. Rood, Huntington, W. Va., for plaintiff.

Milton J. Ferguson, U. S. Atty., and George D. Beter, Asst. U. S. Atty., Huntington, W. Va., for defendant.

CHRISTIE, District Judge:

This is an action under Section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), to review a final decision of the Secretary of Health, Education and Welfare. This matter was previously before this Court and by Order dated October 24, 1966, the cause was remanded to the Secretary for the securing of additional evidence. We are again called upon to review the Secretary's final decision on this matter which was rendered by the Appeals Council on March 4, 1967, when the February 1, 1967 recommended decision of the hearing examiner was modified and accepted. The final decision holds that plaintiff is not entitled to the establishment of a period of disability or disability insurance benefits under the provisions of the Act prior or subsequent to the 1965 Amendments. [1]

■ Plaintiff meets the special earnings requirements of the Social Security Act through the quarter ending September 30, 1969. Under the Act, 42 U.S. C.A. § 416(i), an individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required. Thus the burden is upon the plaintiff to establish by credible evidence that he was disabled within the meaning of the Act prior to April 4, 1967, when the decision of the Secretary became final. However, this need not be carried beyond a reasonable doubt. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964).

■ The standard of review in actions of this nature is found in Section 205(g) of the Social Security Act, as amended, and is as follows:

"The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *."

In short, the Courts are not to try the case de novo, and if the findings of the Secretary are supported by substantial evidence, the Courts are bound to accept them. Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). Nevertheless, it is said that this provision of the law does not contemplate that the Courts should surrender their "traditional function," but rather that they will view the record as a whole, not for the purpose of making an independent finding, but to determine whether or not the finding is supported by substantial evidence and to see to it that the Administrative Agency does not act arbitrarily or capriciously in denying just claims or allowing unworthy ones. Thomas v. Celebrezze, supra; Underwood v. Ribicoff, supra; Snyder v. Ribicoff, 307 F.2d 518 (4th Cir. 1962). In determining the meaning of "substantial evidence," the Courts have held it to be more than a scintilla, but less than a preponderance. Thomas v. Celebrezze, supra. It is such relevant evidence as

---

1. Section 303(a) of Public Law 89-97 (the 1965 Social Security Amendments) amends the meaning of the term "disability" as found in 42 U.S.C.A. § 423 as follows: "(1)nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months * * *." Previously the physical or mental impairment had to " * * * be expected to result in death or to be of long-continued and indefinite duration."

Under the provisions of Section 303(f) of the law, a period of disability may be established by use of this amended definition. However, benefits would only be payable beginning in September 1965 or the seventh month in which an individual has been determined to be under a disability under the amended test, whichever is later.

a reasonable mind might accept as adequate to support a conclusion and it must be based on the record as a whole. Celebrezze v. Bolas, 316 F.2d 498 (8th Cir. 1963). The Fourth Circuit has pointed out that if there is only a slight preponderance of the evidence on one side or the other, the Secretary's findings must be affirmed. Underwood v. Ribicoff, supra. Therefore, the immediate task of this Court is to determine whether the defendant's denial of the plaintiff's claim is supported by substantial evidence.

Plaintiff was born May 28, 1911, and attended school to either the fifth or seventh grade. He is divorced and has three children who live with his brother. He is a singer and dancer by profession, however, his earnings records indicate that he was not financially successful in this field. The bulk of his earnings over the past few years has come from royalties from the song "Marianna." He has written a number of other songs but has apparently received little, if any, income from them. He states that he has not written any songs for the past two years. His last employment, which was evidently the only steady job he has held since his army service in 1944, was as a delivery truck driver for a flower shop in Huntington, West Virgina. He held this job from late 1963 until July 1964 when he allegedly injured his back in a fall and became unable to continue working.

In our prior Memorandum Opinion on this matter we concluded that, while plaintiff alleged the onset of his disability as of August 29, 1960, the record clearly established that he was not disabled within the meaning of the Act prior to his July 1964 accident. At the same time we deemed in inappropriate, since plaintiff expressed a desire to introduce additional medical evidence, to evaluate the medical evidence then in the record. This evidence was submitted and passed upon by the Secretary and we shall now proceed to review all the evidence insofar as it is deemed pertinent to the instant decision.

In view of plaintiff's primary predication of his claim upon the residuals of his back condition and its effect on his legs (R–225), our discussion of his other impairments will be limited. There is no evidence that plaintiff has a cardiovascular impairment or that he is presently suffering from an asthmatic condition, although at times this latter ailment has been temporarily disabling. Similarly, the gastrointestinal condition and ulcer from which he has suffered in the past are evidently under control and do not appear to detract significantly from his over-all ability to engage in substantial gainful activity.

Though it is impossible, on the basis of this record, for plaintiff to show a disability prior to July 18, 1964, in order to evaluate his present condition it is necessary to examine his medical history prior to that time so that his present complaints may be seen in proper perspective. We do not, however, believe that the October 1944 neuropsychiatric consultation he received in the army is of any value in resolving the matter before the Court. Even if we were to assume that everything stated therein were true, its antiquity alone makes it of little probative worth. Although the hearing examiner reviews this report in his recommended decision, there is no indication that it was significant in his ultimate determination and we do not consider the use made of it a sufficient basis to overturn the final decision.

The first medical report with which we will be concerned deals with an examination of plaintiff at the Lawrence County General Hospital in October 1958 for the Lawrence County, Ohio, Department of Welfare. Plaintiff's explanation of the purpose of this examination is not very satisfactory (R–207), however, the report is on a form which states, "This report is required for persons seeking Aid to the Permanently and Totally Disabled or Aid to Dependent Children because of physical or mental disability." The examination dealt principally with plaintiff's abdominal condition, though he also complained that his back gave him a lot of

trouble when doing any kind of lifting. While there was a severe degree of stiffness noted in the back, X-rays of the thoracic and lumbar spine showed no evidence of bone, joint or disc pathology.

On August 29, 1960, plaintiff injured his back while attempting to hook a carnival wagon to a truck. A few days after the accident his back discomfort had increased to the point where he was hospitalized and placed in traction. Dr. Frederick E. Vultee submitted a consultation report dated October 7, 1960 dealing with plaintiff's injury and treatment. X-rays indicated no abnormalities other than to suggest that a myelogram had been performed. Physical examination revealed a reduction of range of motion in the lumbar spine and easily palpable right lumbar paravertebral muscle spasm. There was also some superficial diminution of sensation along the distal lateral aspect of the right thigh as well as the lateral aspect of the right lower leg and foot. It was believed that plaintiff probably had the residuals of a herniated disc at the L–5 level on the right. It was Dr. Vultee's opinion that with conservative management, he would be able to leave the hospital in about two weeks, although he would be unable to do any heavy lifting or physical activity for several weeks.

On January 5, 1961, plaintiff was awarded workmen's compensation benefits by the Industrial Commission of Virginia "on account of total incapacity for work" as a result of this accident.

On December 15, 1961, plaintiff applied for Social Security Disability Benefits. On December 27, 1961, Dr. James F. Scott examined him and described him as unable to walk without crutches and unable to work because of a dislocated intervertebral disc.

From October 22, 1962 to November 4, 1962, plaintiff was again hospitalized for his back complaints and Dr. Vultee was the treating physician. It was observed that, "It seems quite apparent that his (sic) patient at the time of his admission, had a significant functional overlay and did not have objective evidence of the weakness to the extent of which he complained." Nevertheless, there was still objective evidence of mild L–5 nerve root compression. Physical examination revealed a stocking-type sensory loss of the right leg and a moderately reduced right ankle jerk. Plaintiff responded well to treatment and therapy and upon discharge was able to walk with the use of a cane. He had a good walking pattern and demonstrated only mild residual weakness of the anterior compartment musculature of the right leg and mild remaining spasm of the right lumbar paravertebral musculature. The discharge diagnosis was residuals of lumbar strain, right, with mild compression right L–5 nerve root segment, with functional overlay.

By October 1963 plaintiff's condition was such that he was able to begin work delivering flowers. On March 12, 1964 he was admitted to the emergency room of St. Mary's Hospital, Huntington, West Virginia, complaining of severe chest pains. An electrocardiogram was within normal limits and he was discharged on March 28, 1964. The final diagnosis was chest pain, probably resulting from hysteria, and intestinal worms. Plaintiff later filed a claim for workmen's compensation alleging that he had fainted and fallen on his left arm. The claim was rejected and he did not pursue it further. In any event, he returned to work at the flower shop and on July 18, 1964 he allegedly fell down a flight of stairs and reinjured his back. He was admitted to St. Mary's Hospital where he was diagnosed to be suffering from a duodenal ulcer as well as cervical and lumbar strain. During the course of his confinement which lasted 49 days a myelogram was performed and no evidence of defect was shown. The back strain was treated with physiotherapy, traction and medication; the ulcer was also treated.

Following his discharge from the hospital plaintiff was examined by Dr. Thomas L. Scott for the State Compensation Commission. At the time of this examination, October 23, 1964, he was

using crutches and appeared to be unable to walk without a great deal of trembling and shaking. There was no measurable calf or thigh atrophy and deep tendon reflexes were equal and active in both legs. There was a stocking-like hysterical hypesthesia of the right leg. Spinal X-rays showed no abnormalities and it was concluded that he had a severe form of conversion hysteria. It was Dr. Scott's opinion that further orthopedic treatment of the condition was not indicated and that the symptoms would subside spontaneously as soon as plaintiff returned as nearly as possible to his former environment.

On December 7, 1964, Dr. Charles W. Dennison examined plaintiff for the Ohio Bureau of Vocational Rehabilitation. He found normal joint motion of all the major peripheral joints, however, he was described as holding his neck rather stiffly and resisting any movement. The lumbar spine was also held quite rigid and he could not, or would not, bend more than 15 degrees or to either side. The doctor concluded that plaintiff had suffered a ligamentous tear in the lumbosacral area from which he had not completely recovered. It was observed that, while able to stand in the office and walk about the office unassisted, it was doubtful that he could dance professionally with his back and neck so rigid. With the exception of being slightly depressed, his mental state was considered normal.

Plaintiff was hospitalized at Cabell-Huntington Hospital on January 4, 1965, with a respiratory condition. He improved with treatment, however, it was noted (although not absolutely established) that he was surreptitiously elevating the thermometer temperature and thus prolonging his confinement. Dr. Mattill was called in for consultation regarding the back condition and it was his opinion that there was no reason for continued orthopedic treatment. He was discharged January 25, 1965 to be followed as an out patient.

Plaintiff's next hospitalization was at St. Mary's Hospital, from March 7, 1965 to March 27, 1965. X-rays and an electrocardiogram showed no abnormalities. The diagnosis on discharge was (1) unchanged, conversion reaction, hysterical; (2) unchanged regional enteritis; (3) improved duodenal ulcer. Dr. Z. C. Burton treated plaintiff for his abdominal condition during the course of this confinement. He recovered from these complaints but continued to allege that he was unable to bear any weight on his right leg. Dr. Burton concluded that he was reluctant to attribute all of plaintiff's symptomatology to emotional problems, but that rather exhaustive physical evaluation and extensive consultation had not revealed any organic difficulty.

During this same period plaintiff was also seen by Dr. Roy A. Edwards, Jr., a full-time specialist in psychiatry. Dr. Edwards saw him again on June 30, 1965, at which time plaintiff requested that the doctor send a letter to his attorney "regarding the possible connection between his injury in July 1964 and a 'conversion hysteria.'" Dr. Edwards did not know who had given him this diagnosis and, while admitting this was possible, it was his opinion that any disability in this area was orthopedic rather than psychiatric.

Dr. Gary L. Ripley submitted a report to the West Virginia Department of Welfare, dated May 7, 1965. The diagnosis was (1) probable ruptured intervertebral disc with nerve root irritation and injury and weakness in the right leg; (2) arteriosclerotic heart disease; and (3) probable re-occurring regional ileitis. It was felt that there was no part-time work that plaintiff could perform.

On August 27, 1965 plaintiff was examined by Dr. Hassan Vaziri for the West Virginia Department of Welfare. He was described as exhibiting a lot of difficulty getting on and off the examining table. There was tenderness over the lumbosacral area, and motion of the back was limited in all directions. Evidence of hypesthesia over both legs was noted as well as some weakness of the right hip muscles. The diagnosis was (1) lumbar nerve root compression sympton, right side; (2) possible spinal

cord tumor. It was felt that the presence of the nerve root irritation prevented him from doing any type of work. Dr. Vaziri again examined plaintiff on May 26, 1966. Hypesthesia of the right leg was again detected, but it appeared to be inconsistent with typical patterns of segmental nerve distribution. Deep tendon reflexes appeared to be active and present, bilaterally. Muscle power and tone appeared to be intact and there was no motor disturbance. The doctor expressed a belief that the present symptoms related mainly to chronic anxiety and psych-physiological muscle reaction as he was unable to find any objective symptoms in the orthopedic examination.

On October 4, 1965, plaintiff was given a neurological examination by Dr. Hossein Sakhai. It was recommended that he be hospitalized for a complete neurological and neurosurgical work-up. In accordance with this recommendation plaintiff was admitted to Cabell-Huntington Hospital on November 8, 1965. Skull and cervical spine X-rays showed no abnormalities. An electroencephalogram was within normal limits. All reflexes were within normal limits and equal. There was good tonus and no atrophy in the muscles. It was concluded that all of plaintiff's neurological difficulty was not on an organic basis and that with the amount of muscle power he had he should be able to walk without crutches or without too much difficulty.

The final medical report is that of Dr. James A. Heckman, dated October 31, 1966. Plaintiff was described as using good muscle power in both legs but refusing to move his back in any direction because of pain. He also complained of pain on attempted straight leg raising on the right side. Muscle power was described as excellent in both legs and the reflexes were brisk at both ankles. There was a complete stocking anesthesia of the entire right leg. Dr. Heckman could find no orthopedic basis for any disability. It was his opinion that there was no organic pathology to explain plaintiff's complaints and that he was either suffering a complete conversion hysteria or else out-and-out malingering. He recognized that the anesthesia was more in keeping with conversion hysteria than malingering.

It should be noted that, although we previously remanded this matter for the taking of additional evidence on the question of job availability, this was predicated upon the prior hearing examiner's implicit finding that plaintiff was unable to return to his former occupations as a singer and dancer or as a flower delivery truck driver. The Secretary has since concluded that plaintiff is not prevented from returning to his former employment as a delivery truck driver. Consequently, it is unnecessary to evaluate the evidence presented by the various vocational witnesses.

In essence, there is but one issue to be resolved in this matter and that is whether or not Max Bailey has a medically determinable mental or physical condition that necessitates the use of crutches. If he does, the possibility of his securing gainful employment is so minute as to be, for all practical purposes, nonexistent. It is obvious to all that a 56 year old individual who walks with the aid of crutches, with little education or training, will be a passed-over commodity on the shelves of our nation's economy.

Disability cases are frequently before this Court and while each is in a sense unique, the instant matter is far outside the ambit of the usual case. Plaintiff's only reported earnings of substance over the past several years were derived from royalties from the publication of a single song. Thus, while he states that he has written numerous songs, their lack of success has the effect of precluding this from consideration as his usual occupation. He may well retain the physical and mental ability to compose, but, in view of his limited achievements in this area, it could hardly constitute substantial gainful activity. Likewise plaintiff's reported earnings as a singer and dancer are so meager that even if he retained the physical ability to return to this field it is questionable whether it could

be considered substantial gainful activity within the meaning of the Act.

█ As already stated, in this type case the courts are required to examine the record as a whole. Once a clinical symptom is known to exist, its disabling effect must be considered in light of all the circumstances, including the particular claimant's subjective reactions and general background. Mode v. Celebrezze, 359 F.2d 135 (4th Cir. 1966). When, as in the present situation, the record is voluminous and contains various indications reflecting on the bona fides of claimant's over-all attitude, neither the Secretary nor the Courts should remain oblivious to them.

The individual who emerges from this record presents the picture of an unfulfilled entertainer. We are not presently concerned with this aspect of plaintiff's life, although admittedly it has some effect upon his present attitude. His employment record, with the exception of his last job as a delivery truck driver, is that of an odd-job man. The wages he has earned have been meager. We cannot determine whether this was by choice or because his limited training relegated him to this station. Perhaps it was because of his desire to direct his abilities toward show business. If such were the case it is of no moment. The important picture, insofar as the present case is concerned, is of an individual frequently seeking various welfare benefits allegedly because of injuries or an inability to work.

█ Everyone is aware that the legislation with which we are here concerned has for its purpose the attainment of an humanitarian end, and, like all remedial statutes, should be liberally construed, interpreted and applied that it may accomplish the beneficent results intended. But, however wholesome the purpose and intent of the legislation may be, still the burden of establishing a claim under it is left to rest upon the one who asserts it and no rule of liberality will take the place of required proof. Thus, the award of benefits cannot rest

upon imagination, speculation, conjecture or sympathy—only credible proof in some form will suffice.

Nor can it be doubted that every citizen has the legal and moral right to seek that which the lawmakers have said it is his just due, and by this token let us say that Max Bailey is not to be condemned for his persistence in seeking the benefits of all programs available to him. But no reasonable person will deny that the programs of which we speak are often taken as an invitation to some to seek their aid when, in truth, they are undeserving. It is because of this that certain standards and tests for their administration are required to be established to differentiate such programs from a form of direct relief. It thus becomes the clear duty of those charged with administering such programs to adhere to these standards and apply them fairly and fearlessly lest the programs themselves become the subject of abuse and ridicule.

With this in mind let us examine the instant record. Since plaintiff allegedly injured his back in July 1964 he has spent untold hours under the care and treatment of orthopedic specialists. These men have been unable to find any organic cause for his back and leg complaints nor have neurological specialists detected any cause therefor. This Court will be the first to recognize that the science of medicine has not reached that stage of perfection whereby its practitioners have become infallible. This is attested to in the present case by the orthopedist saying the problem is one of neurology; the neurologist saying it is one of orthopedics; both saying it may be conversion hysteria; and the psychiatrist denying that this is the case. It is probably because of this sort of confusion that the Courts refuse to accept as bind a physician's opinion on the ultimate fact in issue in these cases. Underwood v. Ribicoff, supra.

█ While some of the general practitioners who examined plaintiff diagnosed various orthopedic and neurological conditions, such hypotheses must give way to

the results of the exhaustive tests and treatment performed by these specialists. The orthopedic and neurological causes of conditions such as plaintiff's are not so difficult to detect and so elusive that we are at liberty to ignore their conclusions. Such findings, while not conclusive, are entitled to substantial weight. Heslep v. Celebrezze, 356 F.2d 891 (4th Cir. 1966).

■■■ We believe that the overwhelming weight of the medical evidence in this case supports the Secretary's conclusion that plaintiff has failed to establish a medically determinable physical impairment, either orthopedic or neurological, that necessitates the use of crutches or precludes a return to his prior employment as a delivery truck driver.

But, says plaintiff, "regardless of what the doctors say I cannot walk without my crutches." Being aware of this lack of any organic basis for his condition, plaintiff inquired of an examining psychiatrist about the possibility of his being the victim of "conversion hysteria." This is rather remarkable; as a rule a patient advises his physician of the symptoms, leaving the diagnosis to the physician.

Because of an inability to find any other explanation for the loss of sensation in his right leg, some of the examining physicians concluded that plaintiff suffered from this type of mental ailment. The psychiatrist did not find this to be the case. Should we then deny plaintiff's claim solely because his physicians are unable to pinpoint the medical cause of his condition? We do not think the law so harsh. On the other hand, should benefits be granted because a claimant has succeeded in confounding his doctors?

■■■ This Court would have no hesitancy in accepting the diagnosis of a conversion reaction and making it the basis of awarding benefits were we not convinced from our examination of the entire record that plaintiff's condition is more self-induced than real. We are fully cognizant of the reluctance of some

courts to base a denial of benefits upon the claimant's lack of motivation, Lippert v. Ribicoff, 215 F.Supp. 28 (N.D.Calif. 1963), and of the teachings of Carico v. Gardner, 377 F.2d 259 (4th Cir. 1967) that the questions of motivation, or the lack of it, cannot be simply regarded. Yet, when a court of review is called upon to reverse the fact finder, where motivation and credibility are important factors, as they are here, it would seem that by analogy the standard prescribed by Rule 52(a), Fed.Rules Civ.Proc., 28 U.S. C.A., should be accorded appropriate consideration. Under this rule, the court's findings of fact are not to be set aside unless clearly erroneous, and due regard must be given by the reviewing authority to the opportunity which the trial court had to see and observe the witnesses and judge their credibility. Tuttle v. American Oil Co., 292 F.2d 123 (4th Cir. 1961). Also pertinent to this consideration are certain circumstances of which due note must be taken: (a) Similar previous symptoms used by claimant to induce physicians to conclude that he would be unable to walk without crutches, which it later appeared was not the case; (b) workmen's compensation claim for an alleged arm injury for which there was no evidence whatsoever; (c) the surreptitious elevation of temperature during his recent hospitalization; (d) the inquiry to the psychiatrist as to the possibility of his being a victim of "conversion hysteria"; and (e) the lack of calluses on his hands after several months of "claimed" use of crutches.

In our opinion it is a gross oversimplification to divide individuals into either the class of the true mentally ill or the malingerers. There must be an area of gray between the two where there is some degree of overlapping. Psychiatrists themselves may draw different conclusions from the same act or facts and it behooves the courts to tread lightly in questionable cases. While the stocking-type anesthesia of the right leg is indicative of a conversion reaction, yet the record as a whole belies this and suggests instead malingering.

In view of the limited scope of this review, we need only say that we are convinced that there is substantial evidence upon which the Secretary could reasonably conclude that plaintiff has failed to establish the requisite degree of a medically determinable mental or physical impairment which necessitates the use of crutches and which in turn prevents a return to his former occupation as a delivery truck driver. The Secretary's Motion for Summary Judgment is accordingly granted.