330 F.2d 732
 UNITED STATES of America, owner of the U.S.S. DARBY (DE 218), Helen Hesson Crandell, Administratrix of the Estate of Charles Edward Crandell, deceased, and Bertha Louise Johnson, Administratrix of the Estate of Thomas Edward Johnson, deceased, Appellants,
v.
S.S. SOYA ATLANTIC, her engines, boilers, tackle, etc., in rem and against Rederi A/B Walltank, Owner of the S.S. Soya Atlantic, in personam, Appellees.
 No. 8947.
 United States Court of Appeals Fourth Circuit.
 Argued September 25, 1963.
 Decided April 13, 1964.
 
 Alan Raywid, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., Sherman L. Cohn and Charles D. Ferris, Attorneys, Dept. of Justice, and Joseph D. Tydings, U. S. Atty., on brief), for appellant, the United States.
 Calvin E. Cohen, Annapolis, Md. (Wright & Cohen, Annapolis, Md., J. Calvin Carney and J. Calvin Carney, Jr., Baltimore, Md., on brief), for appellants, Crandell and Johnson.
 Eugene F. Gilligan, New York City (Ober, Williams, Grimes & Stinson, Baltimore, Md.; Hill, Betts, Yamaoka, Freehill & Longcope; Eli Ellis, New York City, and Southgate L. Morison, Baltimore, Md., on brief), for appellees.
 Before HAYNSWORTH, BOREMAN and J. SPENCER BELL, Circuit Judges.
 HAYNSWORTH, Circuit Judge.
 
 
 1
 We affirm the District Court's exculpation of the SS Soya Atlantic and its holding that the ship collision was the sole fault of the USS Darby, which miserably failed to heed its obligations as the burdened vessel. The two ships collided in clear, calm weather early one night in March 1960 shortly after the Soya Atlantic had left the mouth of Chesapeake Bay and had started her sea voyage south to Venezuela and as the inbound Darby was returning to her base at Little Creek, Virginia.
 
 
 2
 The Swedish owned Soya Atlantic is a combined tanker and ore carrier 596 feet long and with a beam of 75 feet. She left Baltimore on the morning of March 19, 1960, and after an uneventful passage down Chesapeake Bay she dropped her pilot at the mouth of the Bay at about 1935, it then being well after sundown and close to the end of twilight. In order to form a lee for the small boat that was to take off the pilot, she came to a heading of 160,° and her headway had been reduced to approximately one knot. When the launch was clear, the Captain ordered a hard left rudder and engines full ahead. Shortly thereafter, he ordered the rudder amidship, and the ship steadied on a heading of 115.° The Captain checked and found that this course would take him too close to Buoy 2A, which he expected to pass on his porthand at a distance of approximately one-half mile. The course was changed to 125.° At 1945, the course was again altered to 134.° That is the bearing of Buoy 2CB from Buoy 2A, and it was the Captain's plan, as was his custom, to run the buoys until he was seaward of the last one. There was testimony that he had sighted an inbound ship in the neighborhood of Buoy 2CB and came to a heading of 134° before he was abeam of Buoy 2A in order to insure a safe port to port passage with the inbound vessel. At 1950, the Soya Atlantic passed abeam of Buoy 2A and the Chief Officer notified the engine room that the sea voyage had begun.
 
 
 3
 During all of this time the speed of the Soya Atlantic was constantly accelerating from the one knot she was making when she dropped her pilot to ten to twelve knots at 1951 when her engines were stopped because of the imminence of collision with the Darby.
 
 
 4
 The USS Darby is a destroyer escort 306 feet long, with a beam of 36 feet. Highly maneuverable, she was capable of speeds up to 24 knots. With other Naval vessels, she had been engaged in exercises at sea that day and had served as flagship of the flotilla. Aboard her were a number of dignitaries, including an Assistant Secretary of the Navy, a member of the Congress and an Admiral. At the conclusion of the exercises, the Darby's Captain was instructed to return the vessel to her base at Little Creek, and, as the Darby approached the Soya Atlantic, she was inbound on a heading of 266° making 19 knots.
 
 
 5
 The Soya Atlantic had sighted the Darby when she was some four to six miles away. Indeed, when the Captain came on the bridge shortly before the Soya Atlantic dropped her pilot, the pilot pointed out the Darby as one of the ships in the vicinity. Because of the lowness of her masthead lights, the Soya Atlantic's Captain mistakenly assumed that she was a fishing vessel. On other voyages he had encountered inbound fishing vessels in the area, and he expected the Darby to come up to Buoy 2A, as he had seen other fishing vessels do, and to pass astern of the Soya Atlantic, as was the Darby's obligation as the burdened or giving-way vessel. He had observed the Darby from time to time after the pilot was dropped. He did not take precise bearings or undertake to compute the Darby's course and speed, but shortly after Buoy 2A was passed the Captain and First Officer of the Soya Atlantic became concerned about the Darby, which appeared to be holding to a crossing course and had not come to starboard to pass astern of the Soya Atlantic. Within a minute after 1950, the Soya Atlantic sounded four whistle blasts, the danger signal, and her Captain telegraphed all engines stopped.
 
 
 6
 There were some twenty men on the bridge of the Darby and there was a lookout forward, though the lookout was clearly incompetent, as the District Judge found, and communicated no information to the bridge. The Soya Atlantic was seen from the bridge, but it was assumed she was a ferry. This assumption was made despite the fact that no ferry operated within a number of miles of the location of the Soya Atlantic. The fact that the Soya Atlantic swung to drop her pilot and thereafter swung back to the East and was constantly accelerating her speed may have confused those aboard the Darby, but outbound vessels regularly maneuvered as the Soya Atlantic did in dropping their pilots at the Virginia or Baltimore Pilot Boats, and thereafter, at accelerating speed, those headed south would take the approximate courses of the Soya Atlantic. The Darby's crew were not unfamiliar with the waters or with the patterns of the very heavy maritime traffic in the area, but, apparently, until about the time the Soya Atlantic sounded the danger signal, it never occurred to anyone on the Darby's bridge that the Soya Atlantic was an outbound vessel on a crossing course traveled by many outbound vessels. Just after the Soya Atlantic's signal, the Darby sounded the danger signal. Left rudder, not right rudder, was ordered and the Darby's engines were reversed.
 
 
 7
 Meanwhile, after telegraphing her engines stopped, the Master of the Soya Atlantic ordered hard right rudder and sounded a one-blast signal. The signal would have been appropriate under the International Rules to indicate a turn to the right, but the ships were just within the boundary where the Inland Rules applied, and, under the Inland Rules, the one blast indicated that she was holding her course and speed. The signal was not heard aboard the Darby, however, so the fact that the wrong signal was given played no part in the collision. After the Soya Atlantic's bow had begun to swing to the right, her Captain decided he could not possibly pass in front of the Darby so he ordered hard left rudder. In response, the Soya Atlantic had returned to a heading of approximately 134° when her bow cut into the Darby which was then lying virtually dead in the water, her beam squarely presented to the Soya Atlantic as a result of the Darby's reversal of her engines and her turn to the left. Shortly before impact the Darby's engines were ordered stopped and then ahead, but the latter order was not executed.
 
 
 8
 The Soya Atlantic's engines had been ordered stopped at 1950. When her Captain ordered hard left rudder, he ordered the engines half astern and almost immediately thereafter full astern. At the time of impact, however, the Soya Atlantic was still making approximately eight knots. Her bow cut deeply into the starboard side of the Darby some 75 feet forward of the Darby's stern, killing two of the Darby's crew.
 
 
 9
 Personal representatives of the two members of the Darby's crew and the United States are the appellants here. They do not here contest the District Court's finding of fault on the part of the Darby. They do contend that the District Court should have found the Soya Atlantic jointly responsible.
 
 
 10
 Much of the effort of the appellants in this Court is an attempt to retry factual issues resolved by the District Court. Despite substantial evidence that the navigation lights of the Soya Atlantic were on long before her pilot was dropped, they reassert the Darby's contention that the Soya Atlantic's navigation lights were not on until she was abeam of Buoy 2A. They find fault with the Soya Atlantic on the ground that her lookout, engaged in securing the ladder which had been used by the pilot to go over her side, had not returned to his post, while the Soya Atlantic's Master, her first Officer and her helmsman, alone on her bridge, had navigational duties as well as duties of lookout. The District Court found, however, that the Darby was not unobserved from the Soya Atlantic and that everything was done which would have been done if the lookout had been at his post adding his observation to that of the Captain and the First Officer.[1] The appellants assert that the Soya Atlantic did not come to a heading of 134° until she was abeam of Buoy 2A, though the only direct evidence on the point is that of the Soya Atlantic that she came to that heading earlier, as the District Court found. They charge the Soya Atlantic with negligence in authorizing the engine room to secure for the sea voyage when the Soya Atlantic was passing Buoy 2A and before she was clear of the congested traffic in the approaches to Chesapeake Bay, though the evidence showed no delay in the engine room's execution of the successive signals from the bridge to stop engines, go half astern and full astern. They assail the Soya Atlantic's log on the basis of three apparent erasures in it, erasures which the District Court disregarded in light of the Soya Atlantic's explanation of them and of her engine room log which bore no erasures.
 
 
 11
 All of these factual contentions we lay aside. It is now settled beyond all question that appeals in admiralty are not trials de novo, and that our scope of review is no broader than that of factual contentions in nonadmiralty cases tried to a district court without a jury.[2] The District Court's findings are binding upon us unless clearly erroneous. While we cannot say that the conflicting evidence would not have supported contrary findings, it was for the District Court to resolve the conflicting evidence on the subsidiary factual questions, and, since the findings which he actually made are supported very substantially, we cannot disregard them.
 
 
 12
 The factual issues are fully discussed and considered in the comprehensive opinion of the District Court.[3] We need not further discuss them here.
 
 
 13
 There remains, however, a question as to whether, accepting the facts as found by the District Court and as summarized above, the Soya Atlantic discharged her duty as the privileged or holding-on vessel. The appellants contend that, under the rules, the Soya Atlantic should have taken evasive action earlier and more effectively than she did. This involves subsidiary questions as to whether the Soya Atlantic, under the circumstances, can be said to have been holding her course and speed as she maneuvered after dropping her pilot, and whether she departed from her course and speed as soon and as decisively as she should have. There is a further contention of fault on the part of the Soya Atlantic in failure to give passing signals when it was apparent to her that the vessels were on crossing courses but before the danger of collision was recognized and the danger signal was sounded.
 
 
 14
 Under the Inland Rules, which applied here, vessels approaching each other head and head are required to make a port to port passage and when approaching so nearly end on end as to involve risk of collision, each is required to signal in advance her intention to effect a port to port passage.[4] If so far to starboard as not to be head and head, signals for a starboard to starboard passage are required.
 
 
 15
 Under the Pilot Rules, which apply when not inconsistent with the Inland Rules, pilots are required to give the passing signals not only when the vessels are meeting, but when passing or meeting at a distance within a half a mile.[5]
 
 
 16
 It is plain that, while Pilot Rule 80.3 requires signals in passing situations as well as meeting situations, and in both situations when the vessels are on courses which will bring them within one-half mile of each other whether or not their courses may otherwise be said to involve risk of collision, it does not apply in crossing situations.[6]
 
 
 17
 Pilot Rule 80.3 makes no reference to vessels on crossing courses and it would be fruitless to require vessels in crossing situations to sound their intention to comply with the absolute duties imposed upon them by Articles 19 and 21 of the Inland Rules. Indeed, signals in crossing situations may create confusion and danger which, otherwise, would not exist.[7] At least, until it became apparent to those on the Soya Atlantic's bridge that the Darby was not complying with her duty, it was not incumbent upon the Soya Atlantic to sound the routine passing signal, and, by that time, the danger signal, not a single blast, was the appropriate signal to have made.
 
 
 18
 Under Articles 19 and 21 of the Inland Rules,[8] when two steam vessels are on crossing courses involving risk of collision, the vessel which has the other on her starboard hand should keep away from the other, while the other shall keep her course and speed.
 
 
 19
 Under Article 27[9] regard must be had to special circumstances which may require a departure from the rules.
 
 
 20
 Pilot Rule 80.7[10] is to the same effect as Inland Rules 19, 21 and 27. It requires the giving-way vessel to go to starboard to cross the stern of the holding-on-vessel, or, if necessary, to slacken speed, stop or reverse. This Rule also provides that if one crossing vessel cannot comply with the other's signals, the danger signal will be sounded and both vessels stopped and backed if necessary until agreement upon a safe passage is reached.
 
 
 21
 Under these rules, the Soya Atlantic, observing the green navigation light of the Darby approaching off the Soya Atlantic's port bow, was required to keep her course and speed, while the Darby, observing the Soya Atlantic's red navigation light[11] off her starboard bow, was required to keep out of the way of the Soya Atlantic. Thus the Darby's plain duty was to turn to starboard so as to pass astern of the Soya Atlantic, or to slacken her speed or stop in time to stay well clear of the Soya Atlantic's course, and those on the bridge of the Soya Atlantic initially had every reason to assume that the Darby would do her duty.
 
 
 22
 It is well settled that the holding-on vessel maintains her course and speed as required by the Rule notwithstanding changes in both her course and her speed so long as the changes are predictable.[12] We have specifically held that an inbound vessel approaching the vicinity of this same Maryland Pilot boat in the mouth of Chesapeake Bay, slowing for the purpose of taking on a pilot, was holding her course and speed within the meaning of the Rule prescribing the duties of the holding-on vessel.[13] The same principle applies to a vessel leaving the vicinity of the pilot boats after it has slowed to discharge its pilot. Accelerating speeds on seaward headings are routine and to be expected of large vessels leaving the vicinity of the pilot boats.
 
 
 23
 The United States would distinguish the Moisie Bay on the ground that the burdened vessel there actually saw the Moisie Bay exchanging signals with the pilot boat and observed the Moisie Bay's deceleration, circumstances from which the District Court there had concluded that the Master of the burdened vessel should have known and understood the Moisie Bay's intentions and anticipated her subsequent maneuvers. Here, it says, the Darby had no means of knowing whether the Soya Atlantic had dropped a pilot in the vicinity of the pilot boats, and the Darby had no other means of recognizing that a crossing situation was presented when, because of the Soya Atlantic's acceleration, the relative bearings were changing.[14] The Darby knew, however, where the pilot boats were and it should have expected large ships seaward bound from their vicinity to be accelerating their speed. She knew that she was approaching a crossing of the track followed by many outbound vessels, and, observing the Soya Atlantic on her starboard bow with its red light showing, the Darby had every reason to believe the Soya Atlantic was following that track and that her speed was, or might be, accelerating.
 
 
 24
 The Soya Atlantic's increasing speed did not lack predictability merely because the incautious Darby rushed into danger without recognition of what should have been apparent to her. We think the District Judge properly concluded that, under the facts as found by him, the Soya Atlantic discharged its duty under the Rule to hold its course and speed.
 
 
 25
 The United States not only contends that the Soya Atlantic was not holding its course and speed, it contends that it held its course and speed too long.
 
 
 26
 The United States takes issue with the conclusion of the District Court succinctly stated in footnote 13 of its opinion:
 
 
 27
 "* * * However, the rule undoubtedly is that the privileged vessel is not required — indeed, not entitled — to take avoiding action until it appears that the burdened vessel, upon whom the primary obligation rests, is unable to avoid collision by her actions alone."
 
 
 28
 The United States suggests that the statement is correct under International Rule 21,[15] which specifically provides that the privileged vessel should take avoiding action when collision cannot be avoided by the action of the giving-way vessel alone. It reads a different meaning into the Inland Rule and to Pilot Rule 80.7, founding its argument principally upon Postal S.S. Corp. v. El Isleo, 308 U.S. 378, 60 S.Ct. 332, 84 L.Ed. 335.
 
 
 29
 There had been a controversy over the validity of that part of Pilot Rule 80.7 which provides that if conditions prevent compliance with the signals of another vessel in a crossing situation, the misunderstanding or objection shall be made apparent by the danger signal and both vessels shall be stopped and backed if necessary until understanding for a safe passage can be reached. In The Fulton, 2 Cir., 54 F.2d 467, Judge Learned Hand expressed the opinion that there was no inconsistency between the Pilot Rule and the requirement of Inland Rule 21, and he criticized the doctrine which seemed to require the holding-on vessel to continue on its course at undiminished speed in the face of certainty that collision was a likely consequence of its action. He felt bound by precedent to hold otherwise, but when the same question came before the Supreme Court in Postal S.S. Corp. v. El Isleo, the Supreme Court agreed with Judge Hand's expression of his personal opinion.
 
 
 30
 The rule of the El Isleo is a particularization of Rule 27 and of Pilot Rule 80.7, each of which permits departure from the rules when necessary to avoid collision, but it is not a general watering down of the requirement of Rule 21 that the holding-on vessel hold on until it becomes apparent that the giving-way vessel cannot by her own evasive maneuvers avoid a collision or does not intend to undertake such maneuvers.
 
 
 31
 In the El Isleo, the burdened vessel had given a two-blast signal, indicating her intention to cross the bow of the privileged vessel, thus informing the privileged vessel that the burdened vessel was not going to maneuver to avoid collision or to discharge her duty under Rule 19. Under those circumstances, the holding-on vessel has no right to insist upon her privilege and duty to the point of collision. She ought not to continue on a collision course at undiminished speed while debating with the burdened vessel about the existence or the nature of her rights and obligations.
 
 
 32
 Here, in contrast, the Darby did not announce her intention to cross the bow of the Soya Atlantic. So long as the Darby had time and space to turn to starboard and cross the stern of the Soya Atlantic, or to stop short of a projection of the Soya Atlantic's course, the Soya Atlantic had no reason to assume that the Darby would not do the one or the other, and until it was apparent to those aboard the Soya Atlantic that the Darby intended to do neither, it was the duty of the Soya Atlantic to hold her course and speed.
 
 
 33
 Any substantial weakening of the requirement of Rule 21 in these circumstances would frustrate one of the prime purposes of the Rule, to insure that the course and speed of the holding-on vessel may be predicted by the giving-way vessel. A requirement that the holding-on vessel alter her course or stop at a time when collision may be avoided by the giving-way vessel alone, and when the giving-way vessel has not indicated an intention not to comply with its obligation, would introduce uncertainties which would create unpredictable hazards for the giving-way vessel dutifully endeavoring to stay clear.[16] If neither vessel was required to hold on until the danger of collision is obvious and imminent, neither would have a basis to predict the maneuvers of the other, and the avoiding action of the one, might be negatived by that of the other.
 
 
 34
 That is exactly what happened in Zim Israel Navigation Co. v. Steamship American Press, S.D.N.Y., 222 F.Supp. 947. The Israel, the holding-on vessel, reversed her engines when she should have maintained her speed. The American Press slowed to permit the Israel to cross her bows, and the collision resulted, in part, because the Israel, instead of clearing the bows of the American Press, backed down. Of course, the Israel's reversal of her engines occurred at a time when it did not appear to her that the American Press was slowing or coming to starboard, but it was before there was obvious and imminent danger which the American Press could not avoid by her own maneuvers. The Israel was therefore found to have committed statutory fault in not holding to her course.
 
 
 35
 We thus conclude that the El Isleo modified the rule only to the extent of holding the privileged vessel responsible if she undertakes to dispute with her stem the clearly indicated intention of the burdened vessel to cross her bows. That decision does not relieve the privileged vessel of her duty to maintain her course and speed in the absence of any such clear indication of an intention on the part of the burdened vessel to disregard her duty, until the danger of collision is obvious and imminent and no longer avoidable by action of the burdened vessel alone. The rule of The Delaware[17] was not modified by El Isleo in the context of this case.[18]
 
 
 36
 Finally, it is contended that the Soya Atlantic should have reversed her engines promptly after sounding the danger signal. The District Court disposed of this contention upon alternate grounds. It was of the opinion that there was no universal rule requiring the Soya Atlantic to immediately reverse her engines, but, if she had committed an error of judgment, it was excusable because made in extremis. It was also of the opinion that the thirty-second interval between the time when the Soya Atlantic's engines were stopped and the time when they were put half astern, and almost immediately thereafter full astern, played no part in the collision. It found that if the engines had been put astern thirty seconds earlier than they were, the collision would still have occurred exactly as it did.
 
 
 37
 In a number of cases, privileged vessels have been found guilty of no fault when reversal of engines was ordered sometime after recognition of imminent danger and alteration of course to starboard.[19]
 
 
 38
 Here the Soya Atlantic properly turned to starboard in an effort to open the way for the Darby to turn to its starboard. Reversal of the engines at that time might have tended to restrict, rather than to enlarge, the available room for the Darby's maneuver. The Darby, however, turned to port and with its fast stop brought herself dead in the water immediately in the path of the Soya Atlantic and squarely abeam of her course. As this maneuver developed, it was appropriate for the Soya Atlantic to go astern. The need for her reversal of her engines was not so apparent earlier. Her turn to starboard might have been quite sufficient to have avoided the collision if the Darby had turned to starboard, or, turning to port, had used her speed to clear the bows of the Soya Atlantic.
 
 
 39
 We are mindful of the principle that when the fault of one vessel is grave, obvious and inexcusable, fault ought not to be found on the part of another vessel, particularly when it is the privileged vessel, so as to require an apportionment, except upon clear and convincing evidence.[20]
 
 
 40
 After consideration of all of the multiple contentions of the United States as owner of the Darby and of the personal representatives of the two sailors who were killed, we agree that the District Court properly concluded that the sole cause of the collision was the fault of the Darby.
 
 
 41
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The absence of a lookout having no other duties is not a basis for a finding of fault if the bridge actually observes what a lookout should have seen. Osaka Shosen Kaisha, Ltd. v. Angelos, Leitch & Co., Ltd., 4 Cir., 301 F.2d 59, 61
 
 
 [2]
 McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; Tuttle v. American Oil Company, 4 Cir., 292 F.2d 123
 
 
 [3]
 213 F.Supp. 7
 
 
 [4]
 33 U.S.C.A. § 203, Art. 18, Rule I. "When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other."
 
 
 [5]
 33 C.F.R. 80.3. "* * * The signals for passing, by the blowing of the whistle, shall be given and answered by pilots, in compliance with the rules in this part, not only when meeting `head and head,' or nearly so, but at all times when the steam vessels are in sight of each other, when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port."
 
 
 [6]
 The Delaware, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771; Compania De Navegacion Cebaco, S.A. v. The Steel Flyer, 4 Cir., 200 F.2d 643; The Boston Socony, 2 Cir., 63 F.2d 246; Sadowski v. The Gremlin, D.C.Md., 147 F.Supp. 869; Zim Israel Navigation Co. v. Steamship American Press, S.D.N.Y., 222 F.Supp. 947; and see Northern Petroleum Tank S.S. Co. v. City of New York, 2 Cir., 282 F.2d 120
 
 
 [7]
 Zim Israel Navigation Co. v. Steamship American Press, S.D.N.Y., 222 F.Supp. 947
 
 
 [8]
 33 U.S.C.A. § 204, Art. 19. "When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."
 33 U.S.C.A. § 206, Art. 21. "Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed."
 
 
 [9]
 33 U.S.C.A. § 212, Art. 27. "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."
 
 
 [10]
 33 C.F.R. 80.7. "* * * When two steam vessels are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steam vessel is overtaking another, the steam vessel which has the other on her own port side shall hold her course and speed; and the steam vessel which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse
 "If from any causes the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steam vessels shall be stopped and backed if necessary, until signals for passing with safety are made and understood."
 
 
 [11]
 This light was presented to the Darby during all of the changes in the Soya Atlantic's heading as she maneuvered to drop her pilot and thereafter
 
 
 [12]
 Commonwealth & Dominion Line v. United States, 2 Cir., 20 F.2d 729, 731, reversed on other grounds 278 U.S. 427, 49 S.Ct. 183, 73 L.Ed. 439; Skibs Aktieselskapet Orenor v. The Audrey, E.D. Va., 181 F.Supp. 697, affirmed Gratsos v. The Moisie Bay, 4 Cir., 287 F.2d 706; Nicholas Eustathiou & Co. v. United States, E.D.Va., 178 F.Supp. 33
 
 
 [13]
 Gratsos v. The Moisie Bay, 4 Cir., 287 F.2d 706
 
 
 [14]
 It is much disputed whether and to what extent the relative bearings were changing in the few minutes preceding 1951 and the recognition of imminent danger. The District Court found that they were relatively constant
 
 
 [15]
 33 U.S.C.A. § 146e
 
 
 [16]
 See The Piankatank, 4 Cir., 87 F.2d 806
 
 
 [17]
 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771
 
 
 [18]
 See Northern Petroleum Tank S.S. Co. v. City of New York, 2 Cir., 282 F.2d 120; Zim Israel Navigation Co. v. Steamship American Press, S.D.N.Y., 222 F. Supp. 947; see also Pacific-Atlantic S.S. Co. v. United States, 4 Cir., 175 F.2d 632; The Piankatank, 4 Cir., 87 F.2d 806
 
 
 [19]
 National Bulk Carriers v. United States, 2 Cir., 183 F.2d 405; The Knoxville City, 9 Cir., 112 F.2d 223; Nicolas Eustathiou & Co. v. United States, E.D.Va., 178 F. Supp. 33
 
 
 [20]
 The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84: The Victory & The Plymothian, 168 U.S. 410, 18 S. Ct. 149, 42 L.Ed. 519; The Bright, 4 Cir., 124 F.2d 45; Compania De Navegacion Cebaco, S.A. v. The Steel Flyer, 4 Cir., 200 F.2d 643; Sadowski v. The Gremlin, D.C.Md., 147 F.Supp. 869